[L. A. No. 24935. In Bank. Dec. 19, 1958.]

LOS ANGELES COUNTY FLOOD CONTROL DISTRICT, Appellant, v. SOUTHERN CALIFORNIA EDISON COMPANY (a Corporation), Respondent.

Harold W. Kennedy, County Counsel, and Edward H. Gaylord, Deputy County Counsel, for Appellant.

Gibson, Dunn & Crutcher, Norman S. Sterry, Ira C. Powers and Martin E. Whelan, Jr., for Respondent.

TRAYNOR, J.—Plaintiff, Los Angeles County Flood Control District, appeals from a judgment entered in favor of defendant, Southern California Edison Company, in an action brought for declaratory relief against numerous public utili-

ties maintaining facilities that must be relocated in the public streets to make way for the construction of storm drains by the district. Edison cross-complained to recover the costs of certain relocations and for declaratory relief with respect to others not included in the complaint. A severance was granted as to Edison, and the only parties to the trial and this appeal are Edison and the district.

The relocations involved are all located within various cities in the county of Los Angeles other than the city of Los Angeles. No question is presented as to the cost of relocating facilities in the unincorporated area of the county or within the city of Los Angeles. In the cities that are involved, Edison operates under various types of franchises; franchises granted pursuant to article XI, section 19 of the California Constitution as it existed before 1911, franchises granted by charter cities, franchises granted by both charter and non-charter cities pursuant to the Franchise Act of 1937 (now Pub. Util. Code, §§ 6201-6302), and other franchises not granted under the 1937 Act but which Edison contends have the same legal effect for the purposes of this action.

The district is engaged in a comprehensive flood control program involving among other things the construction of storm drains throughout its territory. It is conceded that Edison may properly be required to relocate its facilities in the public streets to make way for the construction of the drains. The sole issue is whether Edison or the district must bear the cost of such relocations.

█ In *Southern Calif. Gas Co.* v. *Los Angeles*, 50 Cal.2d 713, 716 [329 P.2d 289], we stated that "In the absence of a provision to the contrary it has generally been held that a public utility accepts franchise rights in public streets subject to an implied obligation to relocate its facilities therein at its own expense when necessary to make way for a proper governmental use of the streets. [Citations.] █ The laying of sewers is a governmental as distinct from a proprietary function under the foregoing rule. [Citations.]" In this respect no distinction has been made between sanitary sewers and storm drains or sewers. (*New Orleans Gaslight Co.* v. *Drainage Com.*, 197 U.S. 453, 461-462 [25 S.Ct. 471, 49 L.Ed. 831]; *B. & Q. Ry. Co.* v. *Illinois* ex rel. *Grimwood*, 200 U.S. 561, 591 [26 S.Ct. 341, 50 L.Ed. 596]; see also *Matter of L. & W. Orphan Home*, 92 N.Y. 116, 119; *City of Cincinnati* v. *Penny*, 21 Ohio St. 499, 508 [8 Am.Rep. 73]; *Stoudinger* v. *City of Newark*, 28 N.J.Eq. 446, 448; *Cummins* v. *City of*

*Seymour,* 79 Ind. 491 [41 Am.Rep. 618, 625]; *Scranton-Pascagoula Realty Co.* v. *City of Pascagoula,* 157 Miss. 498 [128 So. 73, 74]; *Kiley* v. *Bond,* 114 Mich. 447 [72 N.W. 253, 254].)

██ Edison contends, however, that the use of public streets for storm drains can only be considered a primary use of the streets when the principal purpose of the drains is to drain the streets themselves. When, as in this case, the principal use of the drains will be to drain the entire areas served and drainage of the streets will be only incidental thereto, Edison contends that use for drainage is on a parity with its own use, and that therefore the district must pay for relocating Edison's preexisting facilities. We find no basis in the cases for the distinction Edison seeks to draw based on what may be the primary purpose of any particular drain. Thus in the New Orleans Gas Company case, the defendant's purpose was to provide drainage for the entire city and not merely the streets thereof. It would be manifestly impossible to provide drainage for the public streets without also draining the surrounding land, and the right of abutting owners to discharge surface waters onto the public streets is recognized as a customary use of the streets. (*Portman* v. *Clementina Co.,* 147 Cal.App.2d 651, 659-660 [305 P.2d 963]; see also *Kramer* v. *City of Los Angeles,* 147 Cal. 668, 674-676 [82 P. 334].) ██ Moreover, the fact that a comprehensive flood control system requires construction of trunk drains that primarily service areas other than the streets under or across which they are located does not affect the character of the public use or limit the public's right in the public streets. Thus, in the Los Angeles Gas Company case, although the city's sewer served incidentally at most the county street under which it passed, we held that the company's franchise obligations were not affected. ██ "Such obligations rest on the paramount right of the people as a whole to use the public streets wherever located, and the fact that a franchise is granted by one political subdivision as an agent of the state [citations], does not defeat the right of another such agent acting in its governmental capacity to invoke the public right for the public benefit. [Citations.]" (*Southern Calif. Gas Co.* v. *Los Angeles,* 50 Cal.2d 713, 717 [329 P.2d 289].)

Edison contends that any obligation to relocate its facilities at its own expense rests in the police power of the state and that the state has not delegated its police power in this respect to the district. It invokes the rule that grants of

power to municipal corporations are to be strictly construed and any doubts resolved against the existence of the power claimed. (See *Harden* v. *Superior Court*, 44 Cal.2d 630, 641 [284 P.2d 9], and cases cited.) ■ Section 2 of the Los Angeles County Flood Control Act expressly authorizes the district to "construct, maintain and operate," the drains here involved. (West's, Wat. Code-Appendix, § 28.2, 1 Deering's Wat. Code, Act 4463, § 2.) In doing so it is exercising the police power of the state. (*House* v. *Los Angeles County Flood Control Dist.*, 25 Cal.2d 384, 392 [153 P.2d 950]; *O'Hara* v. *Los Angeles County Flood etc. Dist.*, 19 Cal.2d 61, 64 [119 P.2d 23].) ■ By insisting that Edison is obligated to relocate its facilities at its own expense, the district is not seeking to exercise an implied authority to impose additional burdens upon Edison, but is relying on the claimed existence of obligations that arose when Edison accepted its various franchises. (See *City of San Antonio* v. *San Antonio St. Ry. Co.*, 15 Tex. Civ. App. 1 [39 S.W. 136, 139]; *New Orleans Gaslight Co.* v. *Drainage Commission of New Orleans*, 111 La. 838 [35 So. 929, 933], aff'd, 197 U.S. 453 [25 S.Ct. 471, 49 L.Ed. 831].) If, as the district contends, Edison accepted its franchise rights in public streets subject to implied obligations to relocate its facilities at its own expense when necessary to make way for proper governmental uses of the street, there was no need expressly to authorize the district to impose such obligations, for Edison had already assumed them.

■ Edison contends, however, that the 1953 amendment to section 16 of the Los Angeles County Flood Control Act provides for the payment of its relocation costs by the district. The amendment, which follows the act's enumeration of the powers of the board of supervisors of the district, states, "provided, however, that nothing in this act contained shall be deemed to authorize said district in exercising any of its powers to take, damage or destroy any property or to require the removal, relocation, alteration or destruction of any bridge, railroad, wire line, pipeline, facility or other structure unless just compensation therefor be first made, in the manner and to the extent required by the Constitution of the United States and the Constitution of California." (Stats. 1953, ch. 1139, p. 2635, § 1.) This provision cannot reasonably be interpreted, as Edison contends, to mean that compensation is to be made in the manner and to the extent that would be required if the constitutional provisions required compensa-

tion. It clearly provides for compensation only as "required" by those provisions. Had the Legislature intended that the district should go beyond constitutional requirements in making compensation it is reasonable to assume that it would have adopted language similar to that found in many other flood control acts adopted before, after, and contemporaneously with the 1953 amendment. For example the Marin County Flood Control and Water Conservation District Act provides that the district shall "in addition to the damage for the taking, injury, or destruction of property, also pay the cost of removal, reconstruction or relocation of any structure, railways, mains, pipes, conduits, wires, cable, poles, of any public utility which is required to be moved to a new location. . . ." (Stats. 1953, ch. 666, p. 1915, 1919; West, Water Code Appendix, § 68-5 (13); 1 Deering's Wat. Code, Act 4599, subd. 13.) It is true that if the amendment does no more than require compliance with the state and federal Constitutions, its enactment was unnecessary, and given the Legislature's awareness of the problem as evidenced by provisions of other flood control acts enacted at the same session, it is at least dubious that by expressly reaffirming the district's constitutional obligations, it was intended by implication to negative others that might also exist. Had the Legislature in 1953 clearly not wanted the district to pay relocation expenses, it could have expressed this intent also more clearly than by merely reaffirming the district's constitutional obligations. Nevertheless, the fact remains that the plain language of the 1953 amendment provides for payment only to the "extent required" by the constitutional provisions, and if it is anything more than an admonition to obey the constitutions, it constitutes legislative recognition that the district is not obligated to pay for utility relocations unless constitutional provisions so require.

 Edison contends that section 15 of the act grants the district a franchise to use the public streets and that therefore its rights therein are no greater than those of any other franchise holder and, accordingly, that the later user must bear the costs of relocating the earlier user's facilities. Essentially the same contention was answered adversely to Edison's position in the Southern California Gas Company case where we held that a franchise exercised by a city in its governmental capacity is not subordinate to a prior franchise granted to a public utility. (*Southern Calif. Gas Co.* v. *Los Angeles, supra,* 50 Cal.2d 713, 718-719.)

338

Edison contends that the express terms of the Franchise Act of 1937* define its obligation to relocate its facilities at its own expense and that as to franchises granted pursuant to that act any other similar obligations are excluded by clear implication. We rejected a similar contention based on the maxim *expressio unius exclusio alterius est* in the Southern California Gas Company case, and although there are some differences between the franchise provisions involved, the rule of strict construction of public grants in the public interest (*Knoxville Water Co.* v. *Knoxville*, 200 U.S. 22, 33-34 [26 S.Ct. 224, 50 L.Ed. 353] ; *City of Sacramento* v. *Pacific Gas & Electric Co.*, 173 Cal. 787, 791 [161 P. 978] ; *County of Los Angeles* v. *Southern Calif. Tel. Co.*, 32 Cal.2d 378, 384 [196 P.2d 773] ; Civ. Code, § 1069) compels the same conclusion here. As in that case most of the provisions relied on as excluding any implied obligations may reasonably be interpreted as no more than partial expressions of common-law rights and obligations inserted out of an abundance of caution or by way of example only. It is true that section 6297 of the Public Utilities Code may go beyond a restatement of the common-law rule by requiring the utility to remove rather than merely relocate its facilities to make way for public travel, but if it does so, a point we need not decide, it supplies an additional reason why the maxim *expressio unius* does not apply. Had the statute referred only to removal it might cast doubt on the right to relocate instead when relocation would be sufficient to subserve the public interest. There was thus a special reason for mentioning relocation for the specified purposes in section 6297, and it may not therefore be inferred that relocation was included to exclude by implication obligations to relocate for other purposes. (*City of Lexington* v. *Commercial Bank*, 130 Mo.App. 687 [108 S.W. 1095, 1096].) In short, here as in the Los Angeles Gas Company case, the enumeration of

*"The grantee of a franchise under this chapter shall construct, install, and maintain all pipes, conduits, poles, wires, and appurtenances in accordance and in conformity with all of the ordinances and rules adopted by the legislative body of the municipality in the exercise of its police powers and not in conflict with the paramount authority of the State, and, as to state highways, subject to the laws relating to the location and maintenance of such facilities therein." (Pub. Util. Code, § 6294.)

"The grantee shall remove or relocate without expense to the municipality any facilities installed, used, and maintained under the franchise if and when made necessary by any lawful change of grade, alignment, or width of any public street, way, alley, or place, including the construction of any subway or viaduct, by the municipality." (Pub. Util. Code, § 6297.)

what were considered to be the most important of the utilities' obligations cannot reasonably be interpreted as an ''express direction of the Legislature'' passing the utilities' other common-law obligations over to the taxpayer. (*Transit Commission* v. *Long Island R. Co.*, 253 N.Y. 345 [171 N.E. 565, 568]; *New York City Tunnel Authority* v. *Consolidated Edison Co.*, 295 N.Y. 467 [68 N.E.2d 445, 448-449]; *St. Helena* v. *San Francisco etc. Ry.*, 24 Cal.App. 71, 78 [140 P. 600, 605]; *County Court* v. *White*, 79 W.Va. 475 [91 S.E. 350, 352, L.R.A. 1917D 660]; *Peoples Gas Light & Coke Co.* v. *City of Chicago*, 413 Ill. 457 [109 N.E.2d 777, 787]; *Nicholas Di Menna & Sons* v. *City of New York*, 114 N.Y.S.2d 347, 350.)

No contention is made that the provisions of any of the franchises granted to Edison other than pursuant to the 1937 Act are more favorable to its position than those considered above, and accordingly it is unnecessary to consider such other franchises separately.

The judgment is reversed with directions to the trial court to enter judgment for the district declaring its rights in accord with the views herein expressed.

Gibson, C. J., Shenk, J., and Spence, J., concurred.

McComb, J., dissented.

CARTER, J.—I dissent.

The majority opinion in the case at bar is another link in the chain of confusion which exists in the opinions of this court which involves the exercise of the police power and the exercise of the power of eminent domain. I pointed out in my concurring opinion in *Southern Calif. Gas Co.* v. *City of Los Angeles*, 50 Cal.2d 713 [329 P.2d 289], that cases in which the right of eminent domain was involved are cited as authority in cases involving the exercise of the police power and police power cases are cited in support of cases involving the eminent domain power.

I am unable to understand on just what theory the majority relies in the case under consideration. It appears that it *must* be the police power given to the flood control district by the majority of this court which is the basis for its holding that the Edison Company must relocate its facilities at its own expense.

It has *long* been a rule of law in this state that political subdivisions such as drainage districts, irrigation districts,

and the like, are entities of limited powers—those which have been expressly granted them by the Legislature. (*Stimson* v. *Alessandro Irr. Dist.*, 135 Cal. 389, 392, 393 [67 P. 496, 1034] ; *City of Madera* v. *Black*, 181 Cal. 306, 310-312 [184 P. 397] ; *Leeman* v. *Perris Irrigation Dist.*, 140 Cal. 540, 543 [74 P. 24] ; *Bottoms* v. *Madera Irr. Dist.*, 74 Cal.App. 681, 694, 695 [242 P. 100] ; *Harden* v. *Superior Court*, 44 Cal.2d 630, 642 [284 P.2d 9].) The only qualification to this rule is that certain powers strictly necessary to carry out those expressly granted by the Legislature are implied.

The Los Angeles County Flood Control District was created by the Legislature in 1915 (Stats. 1915, ch. 755, p. 1052-1512, §§ 1-23 inclusive). The act is now found in Deering's Water Code as Act 4463, sections 1-23 inclusive, pages 325-354.

Section 2 sets forth the objectives of the act as providing for the control and conservation of the flood, storm and other waste waters of the district "and to conserve such waters for beneficial and useful purposes by spreading, storing, retaining or causing to percolate into the soil within said district, or to save or conserve in any manner, all or any of such waters, and to protect from damage from such flood or storm waters, the harbors, waterways, public highways and property of said district." The same section then provides: "Said Los Angeles County Flood Control District is hereby declared to be a body corporate and politic, *and as such shall have power*: . . .

"1. To have perpetual succession.

"2. To sue and be sued . . .

"3. To adopt a seal . . .

"4. To take by grant, purchase, gift, devise or lease . . . real or personal property of every kind within or without the district necessary to the full exercise of its power.

"5. To acquire or contract to acquire lands, rights of way, easements, privileges and property of every kind, and construct, maintain and operate any and all works or improvements . . .

"6. *To have and exercise the right of eminent domain, and in the manner provided by law for the condemnation of private property for public use, to take any property necessary to carry out any of the objects or purposes of this act,* whether such property be already devoted to the same use by any district or other public corporation or agency or otherwise, and may condemn any existing works or improvements in said district now used to control flood or storm

waters, or to conserve such flood or storm waters or to protect any property in said district from damage from such flood or storm waters.'' (Emphasis added.)

Subsection 7 provides for the incurment of debt and the issuance of bonds; subsection 7a provides for the borrowing of federal funds; subsection 7b provides for the sale of bonds to the county; subsection 8 provides for the collection of taxes; subsection 9 provides for the making of contracts; subsection 10 provides for the granting of easements; subsection 11 provides for the disposal of rubbish; subsection 12 provides for the payment of bond premiums; subsection 13 provides for the disposal of property. The subsections to section 2 as just set forth provide *all* the powers granted to the district by the Legislature. *It is apparent that the district is not granted the right to exercise the state's police power.*

Article I, section 14, of the California Constitution provides, in part, that ''Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for, the owner. . . .'' This refers to the right of eminent domain.

In 1953, section 16 of Act 4463 was amended to provide for certain powers in the board of supervisors in the exercise of the district's right of eminent domain. The amendment provides, in part, as follows: ''[P]*rovided, however, that nothing in this act contained shall be deemed to authorize said district in exercising any of its powers to take, damage or destroy any property or to require the removal, relocation, alteration or destruction of any bridge, railroad, wireline, pipeline, facility or other structure unless just compensation therefor be first made, in the manner and to the extent required by the Constitution of the United States and the Constitution of California.*'' (Emphasis added.)

In my opinion, the Legislature of this state could not have more clearly expressed its meaning: That the relocation of any facility was an exercise by the district of its power of eminent domain and that compensation should be made therefor as provided in the California Constitution, article I, section 14.

The reasoning found in the majority opinion on the meaning and effect of the 1953 amendment heretofore set forth, while extremely ambiguous and a masterpiece of confusion, *apparently* means that since the Constitution of California does not spell out in words of one syllable that relocations of various types of facilities are to be compensated in money, the

Legislature did not really mean what it said—that it intended just compensation to be made for such relocations. It is first argued in the majority opinion that if the amendment only required the district to abide by its constitutional obligations, the amendment was unnecessary; and then that it was "dubious" that the Legislature intended by implication to negative "others" (*probably* constitutional obligations) that "might also exist." Then the following unclear language appears: "Had the Legislature in 1953 clearly not wanted the district to pay relocation expenses, it could have expressed this intent also more clearly than by merely reaffirming the district's constitutional obligations. Nevertheless, the fact remains that the plain language of the 1953 amendment provides for payment only to the 'extent required' by the constitutional provisions, and if it is anything more than an admonition to obey the constitutions, it constitutes legislative recognition that the district is not obligated to pay for utility relocations unless constitutional provisions so require." *When the Legislature clearly states that compensation is to be made for relocations how is it possible for the majority to assume that the Legislature clearly did not want the district to pay for such relocations?* The entire section (16) deals with the district's right of eminent domain and the supervisors' duties and powers in connection therewith. The Constitutions provide that private property shall not be taken or damaged without just compensation being made therefor. There is no reason whatsoever for the nebulous reasoning and negative thinking set forth in the majority opinion.

*If* we assume that the theory on which the conclusion reached by the majority is that the district is exercising the police power of the state, a complete answer is that the district has no police power. In the majority opinion is the following statement: "Section 2 of the Los Angeles County Flood Control Act expressly authorizes the district to 'construct, maintain, and operate,' the drains here involved (West's, Water Code-Appendix, § 28-2.) In doing so it is exercising the police power of the state. (*House* v. *Los Angeles County Flood Control Dist.*, 25 Cal.2d 384, 392 [153 P.2d 950]; *O'Hara* v. *Los Angeles County Flood etc. Dist.*, 19 Cal.2d 61, 64 [119 P.2d 23].)" In constructing, maintaining and operating the drains here involved the district was exercising a power expressly granted to it by the Legislature of this state. It is true that the grant of the power was given by the state as an exercise of the *state's* police power but that is

not to say that in the delegation of the powers *specifically* enumerated in the act creating the district the Legislature also granted to the district the state's police power in other respects. In the House case this court reversed a judgment of dismissal entered after the trial court had sustained a demurrer to the plaintiff's complaint for damages to her property occasioned by the district's negligence in planning, construction and maintenance of certain flood control channel work. We noted that the plaintiff "rests her right of recovery upon article I, section 14, of the state Constitution, which provides that private property shall not be taken or damaged for public use without just compensation to the owner. *The trial court erred in failing to sustain the constitutional basis of the plaintiff's claim under the distinguishable concept of her pleading.*" (*House* v. *Los Angeles County Flood Control Dist.,* 25 Cal.2d 384, 386 [153 P.2d 950] ; emphasis added.) While the court spoke of the police power the case was not decided upon the theory that the flood control district was exercising the police power of the state. It was said : "While the police power is very broad in concept, it is not without restriction in relation to the taking or damaging of property. When it passes beyond proper bounds in its invasion of property rights, it in effect comes within the purview of the law of eminent domain and its exercise requires compensation. [Citations.] In fact, on the point of a governmental agency's liability for damages arising in connection with its undertaking construction work, the prevailing opinion in the Archer case [*Archer* v. *City of Los Angeles,* 19 Cal.2d 19 [119 P.2d 1]] *supra,* does not purport to dispute the settled principle that public necessity limits the right to exact uncompensated submission from the property owner if his property be either damaged, taken or destroyed. Rather it is expressly stated there in the prevailing opinion (19 Cal.2d 23-24) : 'The state or its subdivisions may take or damage private property without compensation if such action is *essential* to safeguard public health, safety or morals. [Citing authorities.] *In certain circumstances, however, the taking or damaging of private property for such a purpose is not prompted by so great a necessity as to be justified without proper compensation to the owner.* [Citing authorities.]' (Italics added.) Thus there is recognized the incontestable proposition that the exercise of the police power, though an essential attribute of sovereignty for the public welfare and arbitrary in its nature, cannot extend beyond the necessities of the case and be made a

cloak to destroy constitutional rights as to the inviolateness of private property." (Pp. 388, 389.) The House case, with its reliance upon the Archer case, demonstrates again the confusion which exists in the cases. The House case involved an action against the *flood control district*. The Archer case involved an action against the city of Los Angeles. Article XI, section 11, of the California Constitution provides that "Any *county, city, town,* or *township* may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws." This is known as the constitutional police power provision. It does not provide that any flood control, or sanitary, or mosquito abatement district may exercise the police power of the state. *O'Hara* v. *Los Angeles County Flood etc. Dist.*, 19 Cal.2d 61 [119 P.2d 23], also relied upon by the majority for its statement that the district was exercising the "police power" of the state was decided upon the theory that a lower riparian owner has no redress for injury to his land caused by improvements in the stream when there has been no diversion of water out of its natural channel. The following statement is found in the majority opinion in the O'Hara case: "Compensation for private property taken or damaged for a public use must be made under article I, section 14, only when the taking or damaging of property is not so essential to the public health, safety, and morals as to be justified under the 'police power,' and the injury is one which would give rise to a cause of action on the part of the owner if it were inflicted by a private person. (*Archer* v. *City of Los Angeles, ante,* p. 19 [119 P.2d 1], this day decided.)" Again, it will be noted, that while the *flood control district* was involved, the Archer case, which involved the *city,* was cited as authority. While the city of Los Angeles may, by constitutional authority, exercise both the police power and the power of eminent domain, a flood control district has *only the authority and powers specifically delegated to it by the Legislature.* In this particular instance the flood control district of Los Angeles County may exercise *only* the power of eminent domain and, by reason of the 1953 amendment to the act as heretofore set forth, the required relocation of certain enumerated facilities by the district is considered by the Legislature to be an exercise of its power of eminent domain and the owner of the facility must be compensated for such relocation. It is only where the state, *or one of its political subdivisions having the right to exercise the police power,* is involved that the so-called "twilight zone"

comes into play and the heretofore quoted language from the Archer case is pertinent. In the case at bar, as in the House and O'Hara cases, a political subdivision, the Los Angeles Flood Control District, is involved and it is emphatically pointed out that the Los Angeles Flood Control District has no right to exercise the police power of the state inasmuch as the Legislature has not seen fit to so authorize it in the act which created it and the amendments thereto.

The 1953 amendment to the act was not an "unnecessary" legislative act as intimated in the majority opinion. The purpose thereof was to make certain that a required relocation of certain facilities by the district was part of its eminent domain power. While the language therein specifically requiring compensation to be paid therefor might be considered unnecessary in view of the constitutional requirement that just compensation be paid for the taking of private property, under the reasoning of the majority it was obviously necessary—even if, under the holding here, quite futile.

I recently prepared a concurring opinion upholding the right of the city of Los Angeles to require a utility company to relocate its facilities without compensation to make way for a sewer line which the city was installing in a public street or road (*Southern Calif. Gas Co.* v. *City of Los Angeles,* 50 Cal.2d 713 [329 P.2d 289]). In said opinion I stated that under the authorities the city was performing a governmental function and was exercising the police power granted to it by the Constitution of this state. It should be perfectly clear from that opinion that the rule announced in the majority opinion there cannot be relied upon in support of the position of the plaintiff here, as neither the Constitution nor the statutes of this state purport to give the plaintiff any of the power exercised by the city in that case.

In my opinion the judgment of the trial court in favor of defendant and cross-complainant, Southern California Edison Company, should be affirmed.

SCHAUER, J., Dissenting.—I am in accord with the principles of law discussed by Mr. Justice Carter and concur in his conclusion that the judgment of the trial court in favor of Southern California Edison Company should be affirmed.

Respondent's petition for a rehearing was denied January 14, 1959. Carter, J., Schauer, J., and McComb, J., were of the opinion that the petition should be granted.